(No. 22131.—)
GUS REIF *et al.* Appellants, *vs.* EDWARD J. BARRETT,
Auditor of Public Accounts, *et al.* Appellees.

*Opinion filed December 22, 1933—Rehearing denied Feb. 13, 1934.*

ROSCOE FORTH, I. H. STREEPER III, JESSE R. BROWN, and L. G. PEFFERLE, for appellants.

OTTO KERNER, Attorney General, (MONTGOMERY S. WINNING, and JOSEPH LONDRIGAN, of counsel,) for appellees.

Mr. JUSTICE HERRICK delivered the opinion of the court:

The appellant Gus Reif, after having first obtained leave of the court, filed his bill on behalf of himself and all other tax-payers in the State of Illinois similarly situated,

in the circuit court of Sangamon county, against the appellees, Edward J. Barrett, Auditor of Public Accounts, John C. Martin, State Treasurer, and Joseph J. Rice, Director of Finance of the State of Illinois, to restrain by injunction the expenditure of public money appropriated for the enforcement of "An act in relation to a tax upon persons engaged in the business of selling tangible personal property to purchasers for use or consumption." (Smith's Stat. 1933, chap. 120, pars. 440-453, pp. 2453-2455; Cahill's Stat. 1933, chap. 120, pars. 426-439, pp. 2389-2391.) Subsequently, by leave of the court, intervening petitions and bills of complaint were filed by Robert Irving Winter and John A. Neu. The original bill, together with the intervening petitions and the other bills of complaint, were amended by leave of the court. The appellees entered their appearance in the circuit court and filed their general demurrer to the pleadings as amended filed by the appellants. On hearing, the demurrer was sustained and the amended bills and amended intervening petitions were severally dismissed for want of equity. Though the language of the different amended bills and amended intervening petitions is somewhat different, yet the general relief prayed is substantially the same. The pleadings of the appellants attack the constitutionality of the Retailers' Occupation Tax act, *supra,* together with other alleged companion bills making certain appropriations in connection therewith. From the decree dismissing the intervening petitions and amended bills the appellants have prosecuted this appeal.

The amended bills charged that the Retailers' Occupation Tax act is violative of section 13 of article 4, section 2 of article 2, article 3, sections 1, 4, 12 and 17 of article 4, section 16 of article 5, sections 1, 2 and 6 of article 9 of the constitution of this State, and section 1 of the fourteenth amendment to the constitution of the United States.

It is earnestly urged by the appellants that the tax in question is a property tax and not an excise or occupation

tax, and that therefore the tax sought to be levied by the Retailers' Occupation Tax act is in violation of sections 1 and 2 of article 9 of the constitution of 1870. As to whether or not a given tax is an excise or a privilege and occupational or a property tax is ordinarily not difficult of solution. They are essentially different types of tax, with no infringement or overlapping of one upon the other. Their character and their object are vastly different. A property tax is levied merely for the purpose of raising revenue and is levied against property. It does not seek or in anywise attempt to control the use, operation or regulation of the property. When the tax is raised the mission of the property tax has been fulfilled. A property tax has nothing whatever to do with the question of privilege, license or permission. On the other hand, an occupation tax has one of two missions: either to regulate and control a given business or occupation, or to impose a tax for the privilege of exercising, undertaking or operating a given occupation, trade or profession. Its effect is to license a person engaged in a given calling or occupation. A license in form may not be issued to a taxpayer but the payment of the tax is the license under the authority of the State to engage in such occupation. Regulation is not a necessary adjunct of an occupation tax. It may or it may not be. The payment of the tax itself is a condition precedent to the privilege of carrying on a business or occupation. The payment of the tax is made mandatory by the act creating it upon the right of the individual to follow the given occupation. An occupation tax may be levied under the general police powers of the State, where its purpose is to regulate or control a given occupation, or it may be levied under the general sovereign powers of the State, where its sole purpose is to raise revenue. Under which power it is levied makes no difference as to the character of the tax. The type of tax is not changed by any name that may be given it under the law through

which it is enacted, neither is the test as to whether or not the occupation tax is the sole revenue or only a part of the revenue of the State.

Some confusion has arisen in the decisions with reference to the constitution giving the right to levy a certain tax. The State does not derive its power to levy a tax from the constitution. States have the inherent power to levy taxes as an integral part of their sovereignty. This power is inherent and absolute, limited only by the restrictions imposed by the constitution, State or Federal. It is not necessary that the power be conferred by the people. The power is exercised by the governing body of the sovereignty, so that in this State the power to tax is inherent in and vested in the legislature. (*Porter* v. *Rockford, Rock Island and St. Louis Railroad Co.* 76 Ill. 561.) In this State the legislature is confined to three forms of taxes by virtue of the limitations of our constitution, as follows: (1) Property tax on valuation basis; (2) occupation tax; and (3) franchise or privilege tax. *Bachrach* v. *Nelson,* 349 Ill. 579.

It is argued by the appellants that because the act exempts the tax-payer from paying a tax on gross receipts for sales made on credit until the account is paid, and that because, also, the act provides that such transactions whereby the possession of the property is transferred but the seller retains the title as security for the payment of the selling price until the price is actually paid, and such credit sales and conditional sales shall not be deemed sales within the meaning of the act until the purchase price is paid, there is thereby an unwarranted exemption and discrimination. The act does not undertake to define or state that a charge account or sale on time is not a sale, but the act as interpreted provides the tax shall only be paid as and when the payments are received by the seller—this, because the tax is not levied on sales but the amount of the tax is adjusted on gross receipts from sales. There is no attempt on the

part of this act to say that a sale is not a sale, but it does differentiate between sales for cash and sales made under conditional sale contracts and sales made on credit. Conditional sales have been held valid. (*Shcrer-Gillett Co.* v. *Long,* 318 Ill. 432.) There is, of course, no receipt, either gross or net, on a conditional sale until a payment has been made for the personal property, so that these provisions attacked are, as a matter of fact, not only logical but wholly consistent with the object of the act. As to sales on time or where payment is deferred, the mere statement of the proposition proves itself that there is no receipt by the person pursuing the occupation of selling personal property until a payment is made on account. Then, and only then, is there a liability *pro tanto* on the part of the seller. The legislature has not attempted by this act to declare that not to be a fact which is a fact. The legislature, however, does have the power, for the purpose of the application of the act, to declare that that which is recognized as a fact may be excluded from such application. (*Winter* v. *Barrett,* 352 Ill. 441.) The purpose of exempting tangible personal property sold under conditional sales contracts and sold on time clearly demonstrates the legislative intent that the tax is not against the property but is a privilege tax, and the amount of the tax is to be measured by the amount of gross receipts received by the person engaged in the business of selling tangible personal property at retail for use or consumption by the buyer. If the tax were levied upon the value of the property sold rather than fixed upon the basis of the receipts there might be some merit in the contention made by the appellants that the tax is a personal property tax or an income tax. However, the appellants are in error in this contention.

The appellants, in support of their position that the tax in question is an income tax or property tax, cite *Bachrach* v. *Nelson, supra,* which held invalid the income tax of 1932. The crux of the decision there was that income

is property, and that under our constitution the legislature is confined to the levy of the three types of taxes *supra;* that, income being property, the law under consideration was held unconstitutional because the tax was levied on a graduated scale and not levied upon a valuation basis. But the very definition of the term "income" demonstrates that the tax was not levied upon a valuation basis but was distinctly levied against income. Income is property. The tax here in question is not levied on the basis of income but is levied on the privilege of engaging in the occupation, the amount of tax calculated on gross receipts, and the *Bachrach case* has no application to the issue as to whether this is an occupation tax.

The appellants in support of this proposition have also cited the cases of *Hanover Fire Ins. Co.* v. *Carr,* 272 U. S. 494, *Hanover Fire Ins. Co.* v. *Harding,* 327 Ill. 590, *Great Northern Railway Co.* v. *Minnesota,* 278 U. S. 503, *Panhandle Oil Co.* v. *Mississippi,* 277 id. 218, *Truax* v. *Corrigan,* 257 id. 312, *Duplex* v. *Deering,* 254 id. 443, *Cudahy Packing Co.* v. *Minnesota,* 246 id. 450, and *Thompson* v. *McLeod,* 112 Miss. 383. A review and analysis of the cases cited by the appellants demonstrate the incorrectness of their position. The cases cited do hold in the several instances that the tax involved in each case is a personal property tax. The tax levied in those several cases, however, is neither identical nor even similar to the levy and measure of the tax adopted by the Retailers' Occupation Tax act of this State.

In the case of *Hanover Fire Ins. Co.* v. *Carr,* 272 U. S. 494, the Supreme Court of the United States said that the Supreme Court of Illinois had held for many years that the payment of a tax on net receipts of insurance companies was a tax on personal property. That case involved the interpretation, for taxation purposes, of section 30 of the Insurance act. (Cahill's Stat. 1933, chap. 73, par. 159, p. 1617; Smith's Stat. 1933, chap. 73, par. 46, p. 1620.)

The section of the statute there under consideration provides for the return of net receipts of insurance companies organized under the act of 1869 for the incorporation of fire, marine and inland navigation insurance companies, and the basis of the tax to be paid by such insurance companies is on the net receipts. The act expressly provides that the same shall be subject to the same rate of taxes, for all purposes, "that other personal property is subject to at the place where located." The act by its language shows that the legislature classified such receipts as personal property. The point decided in the *Carr case* was that for taxation purposes the receipts were subject to debasement the same as other personal property, and that the tax could not be extended upon the full face value of the receipts.

In *Hanover Fire Ins. Co.* v. *Harding,* 327 Ill. 590, section 30 of the Insurance act was before this court. This court held that it was the intent of section 30 to denominate the net receipts of foreign insurance companies doing fire, marine and inland navigation insurance as personal property and to subject such receipts to the same basis of taxation as other personal property was subject to at the place where located. The court said: "The use of the word 'other' indicates that the net receipts were to be considered as personal property and treated the same as other personal property."

The cases of *Cudahy Packing Co.* v. *Minnesota, supra,* and *Great Northern Railway Co.* v. *Minnesota, supra,* each involved the construction and validity of a Minnesota statute levying a tax against railroad companies in lieu of all taxes upon all their property within the State. As a basis for computing the tax each railroad company was required to report, annually, its gross earnings upon the business done upon its lines wholly within the State and upon interstate business the proportion which the mileage within the State was to the mileage of the whole business done. The gross earnings were made by the statute the basis of the

tax, and the amount thereof was measured by the gross earnings in lieu of an *ad valorem* value of property, which is ordinarily the basis for levying a property tax. The two cases are readily distinguishable from the case at bar. There was no attempt to tax or license the business of operating a railroad. The tax levied was in lieu of all other taxes and was plainly a property tax based on gross earnings.

In *Truax* v. *Corrigan, supra,* there was involved the validity of an Arizona statute prohibiting the issuance of any injunction in a labor dispute unless it was necessary to prevent irreparable injury to the property or property rights of the party making the application for which injury there was no adequate remedy at law, and prescribing that such property right must be described with particularity in the application for injunction. The employer there contended that this statute violated the fourteenth amendment to the constitution of the United States by depriving the plaintiff of his property rights without due process of law and also denied him equal protection of the law. The court held that his right to operate a property was a property right and that the statute was unconstitutional. The case of *Duplex* v. *Deering, supra,* is the same in principle.

The case of *In re Skelcton Lead and Zinc Co. Gross Production Tax for 1919,* 81 Okla. 134, cited by the appellants, is more nearly in harmony with the appellants' position than any case cited by them. The Oklahoma court held that the basis of authority for an occupation tax lies in the police power, and its validity depends upon the extent of the police power to regulate and control a given subject. Under the weight of authority in this country the primary purpose, mission or function of an occupation tax is not to regulate and control a given occupation or class of business. Such occupation tax may regulate or control such business. On the other hand, an occupation tax may be levied and enforced without any attempt whatsoever to regulate the business or occupation against which the tax

is levied. The holding of the Oklahoma court is not in harmony with the holdings of this court, and we are convinced that the reasoning of the Oklahoma court is not sound and such decision is not controlling. *Banta* v. *City of Chicago,* 172 Ill. 204; *Price* v. *People,* 193 id. 114; *City of Chicago* v. *Bartee,* 100 id. 57.

*Thompson* v. *McLeod, supra,* involved the validity of a tax levied on persons extracting turpentine from standing trees. The amount of tax was one-fourth of a cent each year for each cup or box. The court there held that such tax was a property tax and violative of that clause of the constitution declaring that taxes should be uniform throughout the State and that property should be taxed in proportion to its value. However, that case is readily distinguishable from the case herein under consideration. The court said in that case: "The act under review does not levy a privilege tax on the right or privilege of selling resin or the gum of the tree as originally extracted and commonly known as 'crude,' but the privilege, if any, which is taxed is the privilege or right of the owner or lessee of pine trees to 'extract turpentine from standing trees.' * * * As stated, the levy is not imposed for the right to sell crude turpentine. If this were done, then anyone engaged in the regular business of buying and selling crude gum might be liable. * * * Appellee, in taking crude gum from his own trees is not directly engaged in any kind of mercantile business. He does not bring his wares into the market place nor upon the stock markets." When that case is explored it is obvious that the tax there levied was against the ownership or possession of trees from which turpentine was extracted. The rate of the tax was for each cup or box, regardless of whether the person taxed was the owner or lessee of the trees. The tax was not against the occupation, for there was no merchandising in the business. No calling was being followed. The amount of resin or gum collected was in nowise the measure of

the tax. It was clearly a property tax, and such decision is not antagonistic to the legislative act herein under consideration.

The case of *Panhandle Oil Co.* v. *Mississippi, supra,* involved the right of the purveyor of gasoline at retail to collect an excise tax per gallon on gasoline sold to the United States government. The United States Supreme Court held that the act could not be applied to a person for sales made to the United States government for the use of gasoline by the coast guard fleet in service in the Gulf of Mexico and for use at the Veterans' Hospital in Gulfport. The decision was based entirely on the proposition that to enforce such tax on sales to the United States was directly to retard and impede the execution by the United States of its constitutional powers to operate the fleet and hospital. The Supreme Court, however, did not hold the act void but merely that it was not enforceable as against sales made to the United States.

After a careful review and study of the cases cited by the appellants we are not convinced of the correctness of the view taken by them that the tax in question is a property tax and not an occupation tax.

The State of Washington recently passed an income tax statute as well as a retailers' occupation tax statute. The Washington Retailers' Occupation Tax statute differed in some of its features from the Illinois act. The Washington statute classified different occupations into some twenty general classes, several of which classes were subdivided and subject to different rates. By the Governor's veto there were eliminated from the provisions of the act, when it finally became a law, those persons engaged in agriculture, using the term in its broadest sense, and also those engaged in rendering services, professional or otherwise. The act provided that there was levied and should be collected from every person an annual tax or excise for the privilege of engaging in business activities, such tax or excise to be

measured by the application of rates against values, gross proceeds of sales or gross income, as the case might be. The income feature was eliminated by the Governor's veto, *supra.* The constitutionality of the act was attacked. The Supreme Court in deciding the case said: "The act does not concern itself with income which has been acquired but only with the privilege of acquiring," etc. The Supreme Court held the act constitutional. (*State* v. *Yelle,* 25 Pac. (2d) 91.) On the same day that the Washington Supreme Court handed down its opinion upholding the validity of the Retailers' Occupation Tax statute it also filed an opinion in the income tax case, holding that the legislature of that State had no power to enact an income tax act, and holding the Income Tax act unconstitutional. *Culliton & McKales,* v. *State Tax Com.* 25 Pac. (2d) 81.

This court, in passing upon the validity of the Retailers' Occupation Tax act passed March 22, 1933, held the tax was not a property tax and was not a tax on purchases of property but was an occupation tax. (*Winter* v. *Barrett, supra.*) The present act has eliminated the features held unconstitutional in the former Retailers' Occupation Tax act as well as some of the other features of that act. The present act has no features of an income tax. Generally speaking, an income tax is necessarily based upon income from investments, gains of a business or earnings from labor, trade or profession. Gifts may or may not be the subject of an income tax, depending upon the wording of the legislative act imposing an income tax. In the case at bar, however, the subject of the tax is the privilege to engage in the business of selling tangible personal property to purchasers for use or consumption. Whether the person following such business makes a profit is wholly immaterial so far as his liability to pay the tax is concerned. He pays not upon profits or income but he pays a tax upon the gross receipts of the business, the amount of the tax being determined by the sum of the total gross

118

receipts. The gross receipts are not the subject of the tax but merely the standard by means of which the amount of the tax is determined. No case has been cited by the appellants which we feel is authority for or which upholds the position taken by them on this issue.

An occupation tax is not a property tax. (*Sawyer* v. *City of Alton,* 3 Scam. 127; *Winter* v. *Barrett, supra; Denver City Railway Co.* v. *Denver,* 21 Colo. 350, 29 L. R. A. 608; *Williamsport* v. *Winner,* 172 Pa. 173, 33 Atl. 544; *Spreckels Sugar Refining Co.* v. *McClain,* 192 U. S. 397, 48 L. ed. 496.) The tax levied by the act is an occupation tax and not a property tax. (*Winter* v. *Barrett, supra; Bowman* v. *Continental Oil Co.* 256 U. S. 642; *Foster & Creighton Co.* v. *Graham,* 285 S. W. (Tenn.) 570; *Gafill* v. *Bracken,* 145 N. E. (Ind.) 512.) Great latitude is given where that power is not limited, by constitutional inhibition, to the legislative body of the State to classify trades, callings, businesses or occupations and to make them subject to tax for the privilege of following a trade, calling, business or occupation. If the classification is not unreasonable, capricious or arbitrary but rests upon some reasonable consideration of public policy there is no denial of the equal protection of the law. (*Price* v. *People, supra; Banta* v. *City of Chicago, supra; City of Chicago* v. *Bartee, supra; Howland* v. *City of Chicago,* 108 Ill. 496; *Magoun* v. *Illinois Trust and Savings Bank,* 170 U. S. 283.) It is not the function of the court to weigh the propriety or expediency of the legislative act or the tax under consideration or to seek for the motives which prompted the passage of the act or the public policy adopted by the legislature in its passage. The court's sole office, if the classification is reasonable and the act is within the power of the legislature to pass and the act does not deny equal protection of the law, is to uphold the validity of the law. The rule of this court has always been that the legislature has plenary power as to the subjects and

objects which it will tax, except in so far, only, as the legislative department is limited by constitutional limitations. (*Harder's Storage Co.* v. *City of Chicago,* 235 Ill. 58.) It is the rule of this court that he who challenges the constitutionality of the legislative act has the burden of showing clearly wherein such act violates such limitations. *Porter* v. *Rockford, Rock Island and St. Louis Railroad Co. supra; Harder's Storage Co.* v. *City of Chicago, supra; People* v. *McBride,* 234 Ill. 146; *People* v. *Newcom,* 318 id. 188; *Michaels* v. *Hill,* 328 id. 11.

The act under consideration is the second act passed by the legislature in 1933 for the purpose of levying a tax upon those engaged in the sale of tangible personal property at retail in this State. The first act was held unconstitutional in *Winter* v. *Barrett, supra.* However, the decision in that case was not that the legislature did not have plenary power to pass an occupation tax law, but the act was declared unconstitutional because of exemptions created by section 1 of the act and because of invalid appropriations created by section 4 and other appropriations made by the act to be used in accordance with section 4.

It is argued by the appellants that the Retailers' Occupation Tax act violates section 2 of article 2 of our constitution and section 1 of the fourteenth amendment to the Federal constitution, in that by requiring the retailer to pay a two per cent tax on his "gross cash sales" he is deprived of his property without due process of law, and this amounts to a confiscation thereof. The language of the present act is not "gross cash sales," as is assumed by the appellants. In support of this argument it is stated that the privilege of contracting or selling is both a liberty and a property right, and that the right to acquire, possess and protect property includes the right to make reasonable contracts and sales.

The act in question does not interfere with the privilege of contracting or selling or with either the liberty or

property rights of the citizen, nor does it prohibit his right to acquire, possess and protect property. Due process of law does not necessarily imply court proceedings. There is no vested right in any form of proceeding or remedy. It is necessary in order to constitute "due process of law" within the provisions of our State and Federal constitutions that orderly proceedings according to established rules which do not violate fundamental rights shall be observed, yet a general law administered in its legal course according to the form of procedure suitable and proper to the nature of the case, conformable to the fundamental rules of right and affecting all persons alike, is due process of law. (*Italia America Shipping Corp.* v. *Nelson*, 323 Ill. 427; *Wilmot* v. *City of Chicago*, 328 id. 552.) The right to buy and to sell and to acquire, own, possess and protect property is a property right. However, the Retailers' Occupation Tax act does not take away from the appellants their rights, severally, to buy and sell and to acquire, own, possess and protect property, nor does it deprive them of their rights, severally, of procedure suitable and proper to the nature of the case, conformable to the fundamental rules of right and affecting all persons alike. They pay a tax for the privilege of engaging in the occupation of a retailer of tangible personal property sold for use or consumption by the purchaser. All persons falling within the class pay the same tax. Owners of personal property and real estate pay a tax upon such property, yet if such persons whose property is taxed do not pay the tax, the property, or so much as is necessary to pay the tax, may be taken from them. But this is not confiscation of their property. The Retailers' Occupation Tax act does not violate the due process of law clause of either the Federal or State constitution, and the tax is not confiscatory. The act does not offend against the provisions of sections 1 and 2 of article 9 of the constitution. (*Winter* v. *Barrett, supra.*) The legislature has the inherent power to tax the occupa-

tion of those persons engaged in the business of selling tangible personal property to purchasers for use or consumption. (*Banta* v. *City of Chicago, supra; Price* v. *People, supra; Braun* v. *City of Chicago,* 110 Ill. 186; *Howland* v. *City of Chicago, supra; State* v. *Yelle, supra.*) The provision of the act imposing a tax measured by gross receipts is valid and is uniform as to the class upon which it operates. *People* v. *Thurber,* 13 Ill. 554; *Walker* v. *City of Springfield,* 94 id. 364; *Kochersperger* v. *Drake,* 167 id. 122; *Winter* v. *Barrett, supra; Magoun* v. *Illinois Trust and Savings Bank, supra; Nebraska Telephone Co.* v. *City of Lincoln,* 82 Neb. 59, 117 N. W. 284; *Southwestern Oil Co.* v. *Texas,* 217 U. S. 114, 54 L. ed. 688; *Oliver Iron Mining Co.* v. *Lord,* 262 id. 172, 67 L. ed. 929; *Moore* v. *State Board of Charities,* 40 S. W. (2d) (Ky.) 349; *Simmons Hardware Co.* v. *City of St. Louis,* 192 S. W. (Mo.) 394; *Clark* v. *Titusville,* 184 U. S. 329, 46 L. ed. 569; *State* v. *Yelle, supra.*

The appellants contend that the act violates the uniformity provisions of section 1 of article 9 as well as the equal protection clauses of the State and Federal constitutions. In support of this contention the test as to whether a legislative act affords equal protection to all persons affected by it is whether the legislative enactment requires the same means and methods to be employed alike by the persons composing the class affected so that the law operates uniformly upon all persons similarly situated. (*C., N. O. & T. P. R. R. Co.* v. *Commonwealth,* 115 U. S. 321, 29 L. ed. 414; *Southwestern Oil Co.* v. *Texas, supra.*) On the alleged violations of the constitution last above mentioned, the reason assumed in support thereof is that there is a discrimination in the act against those dealers who sell for cash, only, and those who sell on credit, the proposition, as stated, being, if any retailer made all his sales for cash, as many do, he would be taxed on all his "occupation," whereas if some other retailer made all or part of his sales

on credit and failed to collect any or all, he would not be taxed on all his "occupation." There is no lack of uniformity in the law or its application. The fallacy of this argument is that it presupposes that the basis of the Retailers' Occupation Tax act is the sales made. Such is not the foundation of the tax. The measure is gross receipts. Weighed by this test there is no discrimination. Those who have gross receipts pay a tax measured upon the gross receipts. Those who sell for cash pay the tax computed on their gross receipts. Those who sell on credit, or partly on credit and partly on cash, pay on the cash sales on the basis of such gross receipts; as to the credit sales they pay on those credits when collected as gross receipts. If it is reasonably possible in a well ordered mind to imagine that an individual engaged in the business of selling tangible personal property always sells on credit and never collects, he would pay no tax, for he would have no gross receipts. Applying the last mentioned test to the act in question it does not violate such constitutional inhibitions. *Winter* v. *Barrett, supra.*

It is next contended that because section 1 of the act provides that the isolated sale of tangible personal property at retail by a person who does not hold himself out as engaged in the business of selling such tangible personal property at retail does not constitute engaging in such business, by reason of this exemption there is a lack of uniformity in the law. The spirit of the legislative act is to levy an occupation tax, the tax paid being adjusted on the gross receipts of persons actually engaged in the occupation specified in the act—not on the fact that sales might be made of tangible personal property for use or consumption by the purchaser thereof. Apparently the legislature had in mind that some question might arise as to whether or not the act was leveled at a person who, while not engaged in the occupation or business of selling tangible personal property as a chief occupation, yet might

have receipts from an occasional sale made by him of some article of tangible personal property even though such article was sold for use or consumption by the buyer. To obviate litigation upon any such transaction that might arise in the course of the administration of the act the legislature had the right to define the business or occupation involved upon whose gross receipts the tax was levied, and not put the people, or the seller in the isolated sale, to the expense of having it judicially determined whether the gross receipts received from an isolated sale, made by a person whose business was not the business of a person engaged in the selling of tangible personal property for use or consumption by the purchaser, made such seller subject to the tax. It could hardly be contended that a lawyer actively engaged in the practice of his profession who might desire to replace his desk with a new desk and in such transaction sell his old desk was a person whose occupation was that of an individual engaged in the selling of tangible personal property for use or consumption by the purchaser. The same is true of the householder who might be moving to some far distant point and in his judgment found it cheaper to sell his furniture and purchase new furniture at his intended new home than to ship his used furniture. Such person making a sale of his used furniture under the supposed circumstances certainly would not be following the occupation of a person engaged in selling tangible personal property within the contemplation of the legislative act. Numerous examples by way of illustration might be cited, but we deem further exposition on that subject unnecessary. It is clear that the act was leveled at that class which carries on the business of selling tangible personal property at retail. The act is not unconstitutional by reason of not making the gross receipts of a person making an isolated sale who does not hold himself out as engaging in the business of selling tangible personal property at retail, subject to such tax. *Winter* v. *Barrett, supra;*

*City of Collinsville* v. *Cole,* 78 Ill. 114; *O'Neill* v. *Sinclair,* 153 id. 525; Words and Phrases, Definition of "Engage in Business;" *Morningstar* v. *State,* 33 So. 485.

It is urged by the appellants that the subject of the act is not expressed in its title, and the act is therefore in contravention of section 13 of article 4 of our constitution. In support of this proposition it is argued that receipts obtained from the sale of personal property have been held to be income and that income has been held to be property, and therefore the present act is a tax on income or property; that the title of the act does not disclose the true character of the act and is misleading, and that therefore the subject of the act is not expressed in the title. What we have heretofore said disposes of the argument of the appellants that the tax in question is an income tax or personal property tax. The purpose of the constitutional provision is to remedy the evil that was sometimes present in legislative enactments, of embracing more than one subject in the title, of the collation of divergent subjects of legislation having no inter-relation, and of procuring the passage of the act as a whole when such legislation could not be passed if written in separate bills. The provisions of section 13 of the constitution are not intended to impede legislation but to protect the people against unwise legislation being passed without notice to the world, and to protect likewise the members of the legislature themselves against being duped by the title of the bill and thus unconsciously vote for a bill upon a part or the whole of whose contents and subjects they are unadvised. However, it is not intended by this constitutional provision that the title of the act shall go into all the details of the proposed law, neither shall it be a table of its contents, but it is sufficient if the title correctly gives the subject matter of the act explicitly and clearly, so as to inform the members of the General Assembly and the public of the subject dealt with and matters inter-related with the subject, even though

some of the provisions of the bill may be diverse, if such provisions go to make an effective and practical piece of legislation. *Winter* v. *Barrett, supra; Riggs* v. *Jennings,* 248 Ill. 584; *People* v. *Williams,* 309 id. 492.

The appellants earnestly insist that the act is violative of section 4 of article 4 of the constitution. By the bill it is alleged that on November 1, 1932, Rodmon E. Grigsby was in default in the payment of public money to the State in the sum of $4674.85; that the Department of Finance, being then and there the proper legal authority, on said day had determined that Grigsby was indebted to the State in such sum; that the department had notified Grigsby that he was in default of such payment; that he failed and refused to pay the amount due; that such facts were true before his election to the legislature; that he was disqualified to hold the office of a member of the house of the Fifty-eighth General Assembly and was ineligible to such office; that on January 24, 1933, at the time of the organization of the Fifty-eighth General Assembly, such disqualification still continued and that the same still continues; that Grigsby was ineligible to qualify as a member and was disqualified to serve as a member of the house and was not eligible to vote on the bill in question; that there were only the number of votes required by the constitution, which was 77 affirmative votes cast in favor of the act in question, one of which was Grigsby's; that by reason of his disqualification his vote was a nullity, and that, therefore, the act never became a law, not having been passed by the General Assembly as provided by the constitution.

From the statement of facts alleged in the bill, and the further fact that the defendants demurred to the bill, it is argued that, the facts being admitted, the law is that Grigsby was disqualified as a member of the house and that his vote should never have been counted. Appellants overlook one salient rule of law, however, and that is, that

jurisdiction of the subject matter cannot be conferred upon courts by agreement; that regardless of how earnestly parties may agree and stipulate as to a given state of facts, and submit, consent and solemnly agree that a given court shall enter a judgment upon the law as found by the court from the facts stipulated, yet parties cannot by any agreement, however solemnly made, whether by signed stipulation or by pleading, confer upon the court jurisdiction to act where no power is in the court to act. Unless, therefore, the circuit court had jurisdiction to pass upon the qualification of Grigsby as a member of the Fifty-eighth General Assembly, it matters not what facts relative to his qualifications or eligibility may have been admitted by the demurrer. It does not follow that the court below, or this court, has any power, jurisdiction or authority to determine the legal conclusion drawn from the facts admitted.

Section 9 of article 4 of the constitution provides as follows: "Each house shall determine the rules of its proceedings, and be the judge of the election, returns and qualifications of its members." Most of the States of the Union, if not all of them, have similar constitutional provisions, and so far as we have been able to find in the research made on this phase of the case, the courts of last resort of the States having similar constitutional provisions have steadfastly held that each house of the General Assembly has sole jurisdiction to determine the question of the qualifications of its members and that its decision upon that subject is final. Our government is divided into three departments: the legislative, executive and judicial. No department of the government may impinge upon the powers of either of the other departments of the government. This power of the House of Representatives is plenary and exclusive. It has the authority to act and to determine upon the qualifications of its members. The power is as complete as any power granted the judicial department or the executive department. The House of Representatives

could not, if it saw fit, delegate this power to the courts or to any other branch of the government. Even if the house acts arbitrarily and in violation of the fundamental rights of one of its members whose qualifications are challenged, the final decision of the house upon that subject is forever conclusive. When the house exercises the prerogatives so granted it, regardless of whether its decision is right or wrong, the matter is forever placed at rest. No court has the right to review the decision of the house or command it to take action or non-action upon the qualifications of its own members. When the house once acts upon the qualifications of its membership the matter is beyond further controversy. Efforts have been made through the courts at different times to distinguish between the qualifications of a member and his eligibility, and, also, statutes have been passed by which it is sought to limit or control this absolute right on the part of the members of the House of Representatives to pass upon the qualifications of its members or to force the legislature to act upon the qualifications of its members, but such decisions of the lower courts attempting to encroach upon this constitutional power granted the House of Representatives have been reversed by the courts of last resort and the power of the house has been sustained in this respect. Such statutes as sought to regulate the course of conduct of the House of Representatives in passing or not passing upon the qualifications of its members have universally been held to be in violation of the constitution. The sacredness and finality of the right of the house to determine the qualifications of its members has been upheld in this State. *People* v. *Hilliard,* 29 Ill. 413.

Massachusetts has a constitutional provision very similar to ours, making her House of Representatives the judge of the qualifications of its own members. The case of *Greenwood* v. *Registrars of Fitchburg,* 184 N. E. (Mass.) 390, decided February 16, 1933, involved a petition for a

writ of *mandamus* by which it was sought to contest the office of a member of the General Assembly of that State. The court there denied the writ, holding that the provisions of the constitution were exclusive in granting to the House of Representatives the power to judge the qualifications of its own members; that the sovereign power had been lodged in that house in that respect and that the court could not disturb it.

An interesting case upon this subject is to be found in *Dinan* v. *Swig,* 223 Mass. 516, 112 N. E. 91. The Massachusetts legislature passed an act, commonly called the Corrupt Practices act, which provided, in substance, that upon the petition of five or more voters having reasonable cause to believe that a successful candidate for the House of Representatives or Senate had committed a corrupt practice in the election, three judges of the superior court should enter a decree declaring the commission of such act, setting forth the facts relative to such findings and certifying the decree and declaration to the secretary of the commonwealth for transmission to the presiding officer of the legislative body to which the candidate was elected. Under this provision a petition was brought against a member of the General Assembly elected in 1916. The three judges entered the decree and findings, and then, in conformity with the provisions of a Massachusetts statute, reported to the Supreme Court of Massachusetts, amongst other matters, the question as to whether the act was constitutional. The Supreme Court held the act violative of the provisions of the Massachusetts constitution.

The State of Georgia has a constitutional provision practically the same as ours, by which the House of Representatives is granted the power to judge and determine the qualifications of its members. An information in *quo warranto* was filed against a member of the house to contest his title to the office, alleging that he was the duly

elected and acting superintendent of schools for Marion county, Georgia, and therefore ineligible under the laws of Georgia to hold the office of member of the House of Representatives. To the information a demurrer was filed. The trial court overruled the demurrer. The judge filed a written opinion in the case, in which he recognized the provision of the constitution of the State which declared that "each house shall be the judge of the election, returns and qualifications of its members." The opinion held, however, in substance, that the question raised was not to the "qualifications" of the respondent but to his "eligibility;" that if the member was found ineligible the court had the right to enter a judgment of ouster, and the trial court proceeded to find that the defendant was ineligible to hold the office. The Supreme Court reversed the judgment of the trial court and held that the word "qualifications," as used in the Georgia constitution, was not subject to the limitations imposed upon it by the trial court. *Rainey* v. *Taylor*, 143 S. E. (Ga.) 383.

Other cases and authority which we deem directly in point upon this subject are: *State* v. *Porter*, 178 Pac. (Mont.) 832; *Opinion of the Justices*, 56 N. H. 570, and 56 id. 574, two cases; *Attorney General* v. *Board of Canvassers*, 155 Mich. 44; 12 Corpus Juris, sec. 388, p. 885.

In this case Grigsby regularly received his certificate of election and qualified as a member of the house, and the House of Representatives seated him as a member of that body. We are constrained to hold that at the time he voted he was a member of the General Assembly. Being such member he was qualified to cast his vote for the Retailers' Occupation Tax act, and such bill is not invalid by reason of any claimed disqualification of Grigsby, and the act is not void, having received the necessary number of votes for its legal passage even though the vote of Grigsby was the deciding vote upon the passage of the bill.

The questions of whether the Retailers' Occupation Tax bill makes an illegal appropriation and contains unlawful delegation of powers are presented for decision in the case.

Section 3 of the Retailers' Occupation Tax act provides that two per cent of the moneys received in payment of the tax to December 31, 1933, shall be paid into the general revenue fund and the balance into the emergency relief fund in the State treasury. All such moneys thereafter received shall be paid into the occupational tax fund in the State treasury. The legislature at the same session passed several other bills which bear upon the disposition of the tax funds collected. Section 4½ of House Bill 1047 (Laws of 1933, p. 70-77,) appropriates to the Department of Finance, for expenses in administering the Retailers' Occupation Tax act, different sums in connection with the general purpose of such administration, aggregating $1,850,000. Senate Bill 738 (Laws of 1933, p. 136,) appropriates to the Illinois Emergency Relief Commission, from the emergency relief fund, $25,000,000, or so much thereof as may be necessary, for administering the provisions of the act creating such commission, which act was passed in 1932. Senate Bill 737 (Laws of 1933, p. 1090,) amends section 5 of the act in relation to State finance and adds section 8½ thereto.

It is contended by the appellants that these several bills are companion bills of the Retailers' Occupation Tax act bill and should be construed together in the consideration of the latter bill to arrive at the legislative intent as embodied in the last named act. On the part of the appellees it is urged that these several bills are not before this court for its consideration. There is some question as to whether these bills are properly before the court in this case, but, acting on the authority of *Winter* v. *Barrett, supra,* and *People* v. *Deep Rock Oil Corp.* 343 Ill. 388, we shall treat the three several bills as before the court and pass upon the issues presented on this branch of the case.

It is claimed by the appellants that the provision of the Emergency Relief act that "such relief shall be provided by distributing funds or supplies and by any other means desirable by the commission," (Laws of 1933, p. 207,) is violative of section 16 of article 5 of the constitution; that the addition of section 8½ to the State Finance act violates not only section 16 of article 5 but also section 17 of article 4 of our State constitution. In addition to the constitutional objections it is insisted that each of the two acts last named is unconstitutional in delegating legislative powers to administrative officers. Section 16 of article 5 provides, in substance, that the legislature in making appropriations shall specify the objects and purposes for which they are made, while section 17 provides that no money shall be drawn from the State treasury except in pursuance of an appropriation, and that no money shall be diverted from any appropriations made for any purpose or taken from any fund whatever, either by joint or separate resolution.

To determine the validity of the two acts before mentioned, other acts passed at the same session of the legislature bearing upon the tax funds from the Retailers' Occupation Tax act are proper to be considered.

Section 3 of the Retailers' Occupation Tax act, so far as it pertains to the disposition of the tax money, is as follows: "Of the moneys received by the department prior to February 1, 1934, on account of taxes imposed hereunder from July 1, 1933, to December 31, 1933, both inclusive, it shall from time to time as such moneys are received, pay two per cent thereof into the general revenue fund and the balance into the emergency relief fund in the State treasury. All such moneys thereafter received shall be paid into the occupational tax fund in the State treasury."

The act creating the Illinois Emergency Relief Commission was passed in 1932 and by its terms expired on

July 1, 1933. (Cahill's Stat. 1933, chap. 23, pars. 463-467, p. 287; Smith's Stat. 1933, pars. 393-395, p. 312.) Senate Bill No. 160 (Laws of 1933, p. 207,) extended the life of the commission to August 1, 1935. Does the Emergency Relief act violate any of the provisions of our constitution, and particularly the provisions hereinbefore stated as being lodged against it? The appropriation is made for but a single purpose—that of providing relief to those who are in destitute and needy circumstances. The court takes judicial notice of general economic conditions. The necessity for relief was urgent, the time for help to unfortunate and worthy citizens was pressing, and to relieve these distressing conditions was the legislative intent in the legislation under consideration. The State is very properly interested in the welfare, health and happiness of its people. The appropriation was not for a double purpose, as provided in the appropriation before this court in *Winter* v. *Barrett, supra.* The appropriation was lawfully made, (*Mitchell* v. *Lowden,* 288 Ill. 327; *Martens* v. *Brady,* 264 id. 178;) for the sole purpose of administering the provisions of the Emergency Relief act.

As to the contention that the Emergency Relief act is an unlawful delegation of "legislative powers" to administrative officers, we believe that a careful reading of the act reveals that no legislative power is delegated. The phrase "by any other means desirable" is the feature objected to.

Legislative power is authority to pass rules of law for the government and regulation of people or property. Where the legislative body has the power to enact a law as a necessary adjunct to such power it has the legal right to adopt a procedure for the administration of such law. It may do this through commissions, or through boards, and it may grant to such administrative bodies certain authority and certain powers in keeping with the spirit of the act for the practical application and operation of the law. It may even invest them with certain discretion to be exer-

cised by them in the discharge of their functions as ministerial or administrative agencies. Such exercise of discretion may be found in laws governing the assessment of taxes, the Industrial Commission, and different examining boards passing upon applications of those desiring to practice professions. It is impractical for legislative acts providing for the health, welfare, protection and necessities of the people through boards or commissions, to prescribe every detail of the duties to be performed by such boards or commissions. Such powers, when granted, are neither judicial nor legislative. The full sentence containing the clause objected to is, "Such relief shall be provided by distributing funds or supplies and by any other means deemed desirable by the commission." The commission might feel it desirable to furnish necessary medical attention to a sick person coming within the purview of the act. The medical care mentioned is neither funds nor supplies, yet the supposed case is within the spirit of the Emergency Relief act and clearly comes under the term objected to, "or by any other means desirable." Yet in the absence of this latter clause the act, if literally construed, would prevent the commission from furnishing the assistance, and in this respect one of the very purposes of the law would be thwarted. The discretion granted is not a judicial or legislative discretion but a ministerial discretion falling within the doctrine of *ejusdem generis* as to powers conferred by the act.

The Emergency Relief act is not violative of the constitution for any of the grounds urged against its constitutionality. *People* v. *Roth,* 249 Ill. 532; *Mitchell* v. *Lowden, supra; Kettles* v. *People,* 221 Ill. 221; *Meyers* v. *Baker,* 120 id. 567; *People* v. *Chicago, Indianapolis and Louisville Railway Co.* 223 id. 581.

The Retailers' Occupation Tax act provides, in conformity with section 7 of article 9 of the constitution, that the tax funds collected shall be paid by the Department

of Finance into the State treasury. Section 8½, added by Senate Bill 737 to the State Finance act, is as follows: "As soon as may be after March 1, 1934, and the first day of each month thereafter, the Governor, the State Treasurer and the Auditor of Public Accounts shall direct the transfer of all moneys in the occupational tax fund at the close of business on the last day of the preceding calendar month, as follows: There shall be transferred to the soldiers' compensation bond, interest and retirement fund and the waterway bond fund sufficient moneys to provide amply for the payment of the principal of and interest on soldiers' compensation bonds and Illinois waterway bonds as they become due. There shall be transferred to the common school fund monthly, one-twelfth of the amount levied for that year. There shall be transferred monthly to the blind relief fund and the University of Illinois fund, respectively, one-twelfth of the amount obtained by applying the rate fixed by law to the valuation of property in the State as assessed for State taxes. The balance of any moneys after transfers have been made to the funds above stated, shall be transferred to the general revenue fund."

In support of their claim that section 8½ violates section 17 of article 4 and section 16 of article 5 of the constitution, the appellants state, in substance, that the provisions of this act permit the Governor, Auditor of Public Accounts and State Treasurer to transfer money from the State treasury for the various purposes set forth in that section; direct that such transfer shall be made as soon as may be after March 1, 1934, and the first day of each month thereafter, and that all moneys in the occupation tax fund at the close of business on the last day of the preceding calendar year shall be transferred every thirty days; require the Governor, Auditor of Public Accounts and State Treasurer to compute, annually, the several rates per cent necessary to produce the sum of $14,500,000 for general State purposes and $10,500,000 for State school

purposes, and that the State tax rate will have been fixed prior to March 1, 1934. The appellants further state that thereby a situation will have developed by which there will have been extended on the collectors' books and in process of collection taxes levied for the year 1933, and that there will be no need of any transfer of money from the occupational tax fund to the funds set out in section 8½.

The creation of separate and distinct funds in the State treasury is regulated by the statute. Except for funds pledged to the retirement of bonds and interest the funds are subject to the legislative will. The funds may be changed, or even abolished, and the funds therein transferred to other accounts or funds. Senate bill 736 (Laws of 1933, p. 945,) is the bill levying taxes in the sum of $14,500,000 for general revenue purposes for each of the years 1933 and 1934; also levying $10,500,000 for the school fund for each of the same two years. Senate bill 739 (Laws of 1933, p. 947,) is the bill amending the University of Illinois Tax Levy act. Senate bill 740 (Laws of 1933, p. 192,) is the bill amending the Illinois Waterway act. Senate bill 741 (Laws of 1933, p. 210,) is the bill amending the Blind Relief act.

Section 11 of the Soldiers' Compensation act provides for the levy of a direct annual tax, in addition to the tax for State purposes, for such sum as shall be necessary and sufficient to pay the interest annually and the principal of the bonds at par as the same mature, issued under the authority of that act. Smith's Stat. 1933, chap. 126½, p. 2746; Cahill's Stat. 1933, chap. 129, par. 230, p. 2672.

A reading of section 8½ will disclose that none of the three State officers named in the section are granted any authority to transfer any money out of the State treasury or to pay any money out of the State treasury. They are merely authorized to transfer the moneys accumulated in the State treasury from the occupational tax fund into the several funds already created by the legislative power

in the State treasury which have been raised either wholly or partly from general property taxes. The functions to be performed in this respect are purely ministerial and administrative. They are neither legislative nor judicial. The duties vested in the three State officers by section 8½ are of the same type and class of duties required of them by the general Revenue law (Senate bill 736). The power of these three officers to exercise such functions has been recognized in this State for over fifty years. (*Edwards* v. *People,* 88 Ill. 340.) When the funds have been transferred by the three State officers the money itself may only be paid out of the treasury by a legislative appropriation against the particular fund to which the money has been tranferred. The provision requiring such three State officers to determine from what account funds should be transferred to another account, or what amount is necessary to pay maturing bonds and interest issued by virtue of the Soldiers' Compensation act and the Waterway act, committed by the act to these officers, does not confer any powers of either a legislative or judicial character on them.

The three bills (Senate bill 739, Senate bill 740 and Senate bill 741,) each severally contain substantially the same provisions imposing upon the Governor, Auditor of Public Accounts and State Treasurer the duty of taking into consideration the funds so transferred when fixing the several State tax rates as provided by Senate bill 736. The three bills added nothing new to those duties that were already entrusted to such officers by law. The provisions were doubtless written into the three measures out of an abundance of caution. The three officers named were merely required to exercise sound business judgment in fixing the State tax rates by taking into consideration money in a fund which could be applied towards reducing the State and school tax rates. They had the lawful right to do this. (*People* v. *Chicago and Alton Railroad Co.* 324 Ill. 179.) The fact, if it be a fact, that for 1933 the funds

from the Retailers' Occupation Tax act would not be available for consideration at the time of the determination of the State and school tax rates would not invalidate the act. The funds would at least be available in reduction of the 1934 tax rates.

It is also argued that the Retailers' Occupation Tax act may produce sufficient funds so that owners of personal property and real estate might not have to pay any taxes on such property. If in the supposititious case advanced by the appellants (which case we find some difficulty in assuming) there was raised from the occupation tax a sufficient fund to relieve those tax-payers who did not come under the class embraced in the provisions of the Retailers' Occupation Tax act from paying any real estate or personal property tax, there would be no violation of the constitutional provisions as to uniformity and equality in taxation, nor would there be any commutation of taxes violative of the constitution. Under the constitution the legislature is limited in its power to levy three classes of taxes, as above stated. The constitution does not require all three of such classes of taxes to be levied—it merely restricts the levy of taxes to these three classes.

It is further urged that the Emergency Relief act violates section 13 of article 4 of the constitution by attempting to amend sections 4 and 15 of the Pauper act (Smith's Stat. 1933, chap. 107, p. 2128; Cahill's Stat. 1933, chap. 107, p. 2120;) without proper reference in the title of the Emergency Relief act. It is argued that the Emergency Relief act is a companion bill to the Retailers' Occupation Tax act. This is not correct. The Emergency Relief act was passed in 1932. Senate bill 160 merely extended the duration of the Emergency Relief Commission for the period of two years from July 1, 1933. However, we will pass upon the issue raised.

The Retailers' Occupation Tax act is complete in itself. As to whether the methods adopted for the expenditure of

the moneys raised by that act are constitutional or otherwise does not in anywise affect the validity of the act. (*People* v. *Sargent*, 254 Ill. 514; *Winter* v. *Barrett, supra.*) The Emergency Relief act is confined to the subject matter expressed in the title without any reference in the body of the act to any amendment or attempt to amend any other piece of legislation. If it should develop that the effect of the provisions of the Emergency Relief act is to amend or repeal by implication the provisions, or some of the provisions, of some other legislative act, such amendment is incidental, only, and in nowise violates the constitutional provisions of section 13 of article 4. *Winter* v. *Barrett, supra; Chicago Motor Club* v. *Kinney,* 329 Ill. 120; *People* v. *City of Chicago,* 310 id. 534; *People* v. *Crossley,* 261 id. 78.

The amended bills filed by the appellants also attack the validity of certain rules and regulations promulgated by the Department of Finance for the operation of the tax machinery set up by that department in the administration of the Retailers' Occupation Tax act. This question is not presented or argued in either the brief or argument of the appellants and is therefore considered, under the decisions of this court, as waived. Moreover, none of the appellants have shown by any of the intervening petitions or amended bills that they are in anywise affected, hindered or prejudiced by the operation of any of such rules. Until they are they are in no position to complain. *Winter* v. *Barrett, supra.*

We have considered all of the points raised on the record by the appellants, and although we have not discussed all of such issues at length in this opinion, we have decided that they were not well taken.

The Retailers' Occupation Tax act and the other legislative acts challenged by the several intervening petitions and amended bills do not violate any of the State or Fed-

eral constitutional provisions urged against them by the several appellants.

The decree of the Sangamon circuit court is correct and should be, and is, affirmed. *Decree affirmed.*